Horace L. PATTERSON et al., Plaintiffs,

v.

YOUNGSTOWN SHEET AND TUBE COMPANY, and Local 6, Bricklayers, Masons and Plasterers International Union of America, Defendants.

No. 71 H 301.

United States District Court,
N. D. Indiana,
South Bend Division.

July 17, 1979.

---

Leroy P. Vital, Chicago, Ill., Frederick T. Work, Gary, Ind., Earl B. Williams, Chicago, Ill., for plaintiffs.

Bernard M. Mamet, Lawrence Summers, Chicago, Ill., Joseph E. Costanza, East Chicago, Ind., for defendants.

Milton Webster, Chicago, Ill., for intervening EEOC.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and REMEDIAL ORDER

ALLEN SHARP, District Judge.

The suit is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), and is based upon EEOC charges filed by certain of the Plaintiffs on September 21, 1969. The EEOC charges were filed against both Defendant Youngstown Sheet and Tube Company (Youngstown) and Defendant Local 6, Bricklayers, Masons and Plasterers International Union of America, AFL–CIO (Local 6), and alleged that because of Plaintiffs' race, Defendants denied them the opportunity to move from the position of mason helper in a collective bargaining unit represented by Local 1011, United Steelworkers of America (Local 1011), to that of brickmason apprentice and brickmason in a bargaining unit represented by Defendant Local 6.

On October 22, 1971, ten individual Plaintiffs filed their complaint alleging various forms of employment discrimination on the basis of race in violation of Title VII. Plaintiffs sought to bring their suit as a class action, and on November 4, 1972, the Honorable George N. Beamer determined that it could be so maintained under Federal Rule of Civil Procedure 23(a) and (b) (2) and (3) on behalf of the following class:

> ". . . black employees of (Youngstown) who are employed as masons' helpers and who have so been employed on or since July 2, 1965 or enjoyed right of recall as of that date."

On April 12, 1974, while this suit was pending, the United States District Court for the Northern District of Alabama entered Consent Decrees I and II in the case of *United States v. Allegheny-Ludlum Industries, Inc.*, 63 F.R.D. 1. Those Decrees covered all employees represented by Local 1011 employed at Youngstown's Indiana Harbor Works, including all of the members of Plaintiffs class here, as well as tens of thousands of other steelworkers throughout the United States. The Decrees provided the systemic relief necessary to resolve all issues relating to acts and practices of discrimination at the respective employers, and determined that compliance with their terms is compliance with Title VII and satisfies any requirement for affirmative action. The Decrees found unwarranted any relief other than back pay which might be awarded in any other action or proceeding that would add to or be inconsistent with the systemic relief provided. Further, Consent Decree I provided for awards of back pay to various "minority" and female employees, and all but 52 stipulated and 5 contested members of Plaintiffs' class accepted such back pay awards and released Youngstown from any further liability.

On March 1, 1977, Youngstown filed its motion for partial summary judgment on the grounds that certain claims which Plaintiffs sought to litigate were both (1) beyond the scope of the suit which could properly be based upon the underlying EEOC charges, and (2) would involve an indispensable party (the United Steelworkers) which had not been charged before the EEOC and could not be made a party to the suit. On May 12, 1977, the Court entered its order granting Youngstown's motion for partial summary judgment, and held that the sole remaining issue in the case was as follows:

". . . the complaint is hereby limited to the issue of whether Defendant Youngstown and/or Defendant Local 6 denied Plaintiffs the opportunity to move from the position of mason helper to that of brickmason or brickmason apprentice because of Plaintiffs' race.[1]

On August 12, 1977, the Court also entered an order pursuant to Plaintiffs' motion for summary judgment as to liability against defendant company, finding that Youngstown

was in violation of 42 U.S.C. §§ 2000e et seq. ("Title VII"), for the period of 2 July 1965—21 September 1969, as it denied Plaintiffs the opportunity to move from ·the position of mason helper to that of brickmason or brickmason apprentice because of Plaintiffs' race. (See 440 F.Supp. 409 (N.D.Ind.1977).)

Thereafter, Plaintiffs and Defendant Local 6 each filed a motion for summary judgment on the issue of the Union's liability. On February 7, 1979, the Court entered its order and memorandum opinion denying both motions based upon a finding that there remained for trial an issue of material fact as to whether Local 6 had engaged in "discriminatory practices" which served to deny Plaintiffs the opportunity to become brickmason apprentices or masons, because of their race. In the February 7, 1979 order, the Court also reserved for trial and subsequent ruling the outstanding issues between Plaintiffs and Youngstown concerning the appropriate relief to be awarded Plaintiffs based upon the Court's August 12, 1977 finding of liability.

A transcript of the trial of this case has been carefully reviewed.

FINDINGS OF FACT

Based upon the evidence adduced at trial, the Court finds as follows:

1. Plaintiffs and the class they represent are black employees of Youngstown, some of whom filed charges of race discrimination with the EEOC naming both Defendant Youngstown and Defendant Local 6. One or more of Plaintiffs received a statutory notice of right to sue from the EEOC and timely brought suit against both Youngstown and Local 6.

2. At all times material herein, Defendant Local 6 has been a labor organization representing brickmasons and apprentices at Youngstown's Indiana Harbor Works and throughout Northwest Indiana. Local 6 had and has more than 25 members at Youngstown alone.

3. As of January 1, 1970, Youngstown's Indiana Harbor Works and Defendant Local 6's membership jurisdiction were located in an SMSA geographical area which contained a Negro population of between

1. On March 14, 1979, Plaintiffs filed their "motion to reconsider scope of 'charge' or/and the complaint as it relates to back pay and/or alternative motion to raise new charge and amend complaint to other discrimination to class." The Court reviewed the parties' memoranda in support of and in opposition to this motion and also entertained further argument thereon at time of trial. The Court denied Plaintiffs' motion for the reasons that the Court's order of partial summary judgment for Youngstown entered on May 12, 1977 was in conformity with applicable rules of law in the Seventh Circuit and under Title VII generally. Further, the Court ruled that Plaintiffs' attempted amendment was designed to raise new and expanded issues immediately before trial and at a time when the case was in its eighth year of litigation, and would, in any event, have served only to create such further delay in disposition of this case, one of the oldest on the Court's docket, that in the exercise of the Court's sound discretion and in the interests of justice for all the parties, the motion would nevertheless be denied.

approximately 15% and 17% (see Pretrial Order, pp. 6, 8; Plaintiffs' Exhibit 8).[2]

4. As of April 13, 1973, Local 6's membership at Youngstown consisted of approximately 1.3% Negroes (Plaintiffs' Exhibit 31; Tr. pp. 372–4).

5. Defendants Youngstown and Local 6 have at all times material herein maintained a collective bargaining relationship and operated under a collective bargaining agreement covering Youngstown's mason apprentices and masons. Pursuant to the express terms of the applicable collective bargaining agreements, Youngstown had the sole and exclusive right to hire mason apprentices and masons (see particularly Local 6 Exhibits A, B and Tr. p. 247).

6. It is established throughout the record that Youngstown had no relationship whatsoever to the Joint Apprenticeship Committee and Program operated by Defendant Local 6 and the Mason Contractors Association of Northwestern Indiana, Inc. (see also Union Exhibits E, F). Thus, Youngstown took no part in establishing, implementing or administering the standards or training utilized in that apprenticeship program, did not enter into any apprentice training agreements such as are used under that program (see Local 6 Exhibit S), and did not monitor or otherwise review the performance of apprentices in that program.

7. However, it is also established throughout the record that at all times material herein, there existed between Youngstown and Defendant Local 6 the practice whereby Youngstown referred prospective mason apprentices to Local 6 for approval as apprentice members of Local 6 before they were assigned as apprentices at Youngstown. This practice was mutually acknowledged by Youngstown and Local 6, and all prospective apprentices were so referred to Local 6 for approval. (See particularly Tr. pp. 322–3, 354, 356; Plaintiffs' Exhibit 30.)

8. At all times material, Defendant Local 6 imposed certain requirements on the admissibility into membership of mason apprentices at Youngstown, to wit: (1) a high school degree or GED equivalent, and (2) an age of not over 22 years or not over 24 years with military service time as a credit (see specifically Local 6 Exhibits G, H; Youngstown Exhibits Y, Z; and Tr. p. 497). There is testimony in the record, and the Court finds, that these requirements were actually enforced at least in a limited fashion by Defendant Local 6 from before July 2, 1965 through at least September 21, 1969 (see particularly Tr. pp. 168–73, 183, 206, 216–7).

9. At all times material herein, Local 6 also had an express preference for the admission of members' sons into membership as apprentices (Local 6 Exhibits G, H; Youngstown Exhibits Y, Z).

10. Certain members of Plaintiffs' class who testified at trial established that they had less than a high school education and were over 22 or 24 years of age at all times material herein (see e. g., Tr. pp. 84, 141, 384–5). There was no evidence adduced that any members of Plaintiffs' class had a high school education and were less than 24 years old. It was established that no member of Plaintiffs' class was admitted into membership in Defendant Local 6 from 1965 until after this lawsuit was filed (Tr. p. 73; cf. also Youngstown Exhibits K–L).

11. The uncontradicted evidence at trial was that there is no correlation to or relationship between having a high school diploma or education and successful performance as a mason apprentice, nor is there any such correlation to a particular age or the status of being the son of a brickmason (Tr. pp. 179–80). The Court now finds that these requirements and preferences have not been shown to be necessary or even substantially related to successful performance as a mason apprentice or brickmason.

---

**2.** References to "Tr. p._____" are to pages of the official transcript of record of the trial held before the Court from March 20 through March 23, 1979; and references to "Exhibits" are to those documents admitted into evidence at the trial.

■ 12. The Court further finds that each of these requirements and preferences has an adverse impact on the members of Plaintiffs' class who do not have high school educations, are over the age of 24, and as black men are not likely to be the sons of the members of Defendant Local 6 who are and have been predominately white. The Court also takes notice of the fact, as reflected in other judicial opinions (*e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)), that a high school education requirement has a disproportionate impact on blacks and thus on the members of Plaintiffs' class.

13. Defendant Local 6 has continued to utilize the high school and age requirements in such a way as to adversely affect the employment opportunities of the members of Plaintiffs' class in that their memberships in Local 6 have been delayed or denied, and they have been admitted only as "improvers" rather than "apprentices" in Local 6 based upon their inability to meet Local 6's age and high school requirements (see Tr. pp. 64, 174–7, 188).

14. It was established in the record and the Court finds that the Local 6 bargaining unit seniority system has been in effect since long before the effective date of Title VII; that as a concomitant of this seniority system, apprentices have not been laid off until they complete their apprenticeships and become journeymen; that during the apprenticeships of the Plaintiff class members, they were not laid off even though white employees with more bargaining unit seniority were laid off; that the Plaintiff class members were laid off only in accordance with their seniority rights under the Local 6 agreement; that the Local 6 seniority system is neutral with respect to Plaintiffs both on its face and in its operation; and that the Plaintiff class members who were laid off after completing their apprenticeships are presently journeymen with all their attendant seniority rights (Tr. pp. 97–8, 348, 361, 411; Local 6 Exhibits A, B; and Group Exhibit 1 to Youngstown's Answers to Plaintiffs' Interrogatories filed December 28, 1978, admitted at trial as evidence).

15. Since before 1965, Youngstown has filled its need for journeymen masons by having the superintendent of the Mason Department complete a requisition for the desired number of masons and inform Local 6 of that number. Local 6 normally referred the requisite number of masons to Youngstown, and unless the applicants failed physical examinations, they were employed and paid at the mason rate of pay. Youngstown has not refused to hire any black or white masons for any other reason, and during the period 2 July 1965—21 September 1969, Youngstown hired 3 black and 5 white masons for a 37.5% black representation among those hired. There were no masons hired from 1969 to 1973, and after that time both black and white masons were hired. Plaintiffs introduced evidence that from 1973 to the present Youngstown has hired 5 black and 15 white masons for a 25% black representation among those hired. The Court again notes as already stated above that the applicable SMSA statistic shows a black population of between approximately 15% and 17%. (Tr. pp. 267–70, 334, 336–7 and Youngstown's Answer No. 1 to Plaintiffs' Interrogatories filed December 28, 1978, 341–2; Youngstown Exhibit N.)

16. Youngstown discontinued the use of its apprentice list for selecting apprentices after Plaintiffs filed their EEOC charges, and no one was selected therefrom after such date. All mason apprentice vacancies occurring at Youngstown after that time have been filled by posting them for bid in the work unit where the Plaintiff class members are employed. (See particularly Tr. pp. 356–60; Youngstown Exhibit O.)

17. Six employees who are or were potential members of Plaintiffs' class were chosen as apprentices under Youngstown's postings system since the date of the EEOC charges. At time of trial, there were 85 employees in the bargaining unit represented by Defendant Local 6, and either 10 or 11 are black (5 of them being potential class members). Thus, black employees currently represent either approximately 12% or 13% of the total mason and mason apprentice

employee complement at Youngstown. (See particularly Tr. pp. 212, 266; Youngstown Exhibit L.)

18. The evidence was uncontradicted and the Court finds that Youngstown's complement of mason and mason apprentice employees declined principally because of technological changes in the steel-making processes from 1965 to 1969 when Plaintiffs filed their charges by 15 employees, and from 1965 to 1971 when Plaintiffs filed their lawsuit by 22 employees. During the period from 2 July 1965—21 September 1969 there were 11 mason apprentices hired by Youngstown and 1 of them was a black man. There were no mason apprentice vacancies and hires from 1969 to 1973, and since that time all mason apprentices selected have been black mason helpers who are or were potential members of Plaintiffs' class herein.

19. Plaintiff Sydney Dent worked as a mason helper in Youngstown's Mason Department from July 2, 1965 until he transferred to the position of oiler in the Utilities Department in May, 1971 (Tr. pp. 51–3).

20. Plaintiff Roosevelt Brown worked as a mason helper in Youngstown's Mason Department from July 2, 1965 until he transferred to the Bridge Shop on April 28, 1969 (Tr. pp. 54–5).

21. Plaintiff Samuel Thomas worked as a mason helper in Youngstown's Mason Department from July 2, 1965 until he transferred to the position of janitor in the No. 3 Sheet Mill on August 5, 1969 (Tr. pp. 56–7).

22. Plaintiff John Hubbard initially testified that he worked as both a mason helper and tractor operator from July 2, 1965 until he became a mason apprentice in February, 1974. However, Plaintiff Hubbard subsequently admitted that he was classified as a tractor operator and was driving a tractor as early as February 22, 1965, and that he did not recall the last time he had received a mason helper's rate of pay rather than that of a tractor operator (four job classes higher). Tr. pp. 60, 90–1; and cf. Youngstown's Answers to Plaintiffs' Interrogatories Nos. 1, 2, 12 filed March 9, 1979. The Court finds that Plaintiff John Hubbard was not a mason helper at Youngstown after July 2, 1965.

23. Plaintiff Horace Patterson worked as as a mason helper in Youngstown's Mason Department from July 2, 1965 through at least September 21, 1969, and has on occasion worked as a mason helper since that time (Tr. pp. 106, 129–30, 133–4; Plaintiffs' Exhibit 9).

## CONCLUSIONS OF LAW

Based upon the foregoing findings of fact and previous rulings in this case, the Court enters Conclusions of Law as follows:

1. The Court has jurisdiction of the cause of action and of the parties herein pursuant to Title VII, 42 U.S.C. § 2000e–5. Defendant Local 6 is a labor organization within the meaning of Title VII, 42 U.S.C. § 2000e(d), and Plaintiffs have met the jurisdictional prerequisites to suit against Local 6 under Title VII.

2. Employment of mason apprentices at Youngstown was not accomplished under or through the Joint Apprenticeship Program of Defendant Local 6 and the Mason Contractors Association of Northwest Indiana, Inc., but rather only in conjunction with membership in Local 6, and the Joint Apprenticeship Committee is not a necessary and indispensable party to suit against Defendant Local 6 herein. Federal Rule of Civil Procedure 19.

3. An extensive and consistent line of authority under Title VII holds that a union is liable for discrimination resulting from a practice or procedure over which the union exercises control, and that this liability requires the union to be made subject to a remedial order. See, e. g., United States v. United States Steel Corp., 520 F.2d 1043, 1059–60 (5th Cir. 1975), cert. den., 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); United Transp. Union Local 974 v. Norfolk & Western R.R. Co., 532 F.2d 336, 341 (4th Cir. 1975); Carey v. Greyhound Bus Co., Inc., 500 F.2d 1372, 1379 (5th Cir. 1974); Guerra v. Manchester Terminal Corp., 498 F.2d 641, 656 (5th Cir. 1974).

■ It is also well recognized in the law that labor organizations, as well as employers, have an affirmative duty to take corrective steps to prevent the perpetuation of past discrimination. *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40, 60 (5th Cir. 1974), *vacated on other grounds,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Carey v. Greyhound Bus Co., supra,* at 1377; *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974).

■ Further, case law teaches that a union may be held liable with an employer when there is a "genuine nexus" or sufficient connection between an employer's and the union's conduct which is found to be unlawful. *Myers v. Gilman Paper Corp.,* 544 F.2d 837, 848 (5th Cir. 1977); *Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721 (5th Cir. 1976).

For a recent massive application of several of the ideas here expressed by Circuit Judge Higginbotham sitting as a District Judge, see *Com. of Pa. v. Local U. 542,* 469 F.Supp. 329 (E.D.Pa.1978).

4. Requiring a high school education for admission as an apprentice generally has been held to constitute a violation of Title VII because the requirement excludes blacks at a substantially higher rate than whites, and has not been shown to be necessary for successful performance in the training program or as a craftsman. Although apprenticeship programs may require a certain level of reading and mathematical ability, the courts have held that the high school degree does not so clearly indicate that an applicant has the necessary reading and mathematical skills as to justify requiring applicants to be high school graduates. See, *e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 221–22, 237–38 (5th Cir. 1974); *EEOC v. Local 638, Steamfitters,* 401 F.Supp. 467, 481–82 (S.D.N.Y. 1975), *mod. on other grounds,* 532 F.2d 821 (2d Cir. 1976).

■ Age limitations on entry into apprenticeship programs, even if facially neutral, also violate Title VII by perpetuating the effects of past discrimination when blacks who were discriminatorily denied entrance into a program in the past are now ineligible for admission because of their age. See, *e. g., Stevenson v. International Paper Co.,* 516 F.2d 103, 116 (5th Cir. 1975); *Pettway v. American Cast Iron Pipe Co., supra,* 494 F.2d at 238–239; *United States v. Local 638, Pipefitters,* 360 F.Supp. 979, 993 (S.D.N.Y.1973), *mod. on other grounds sub nom., Rios v. Enterprise Assoc. Steamfitters, Local 638,* 501 F.2d 622 (2d Cir. 1974).

And a preference expressed for sons of those who are already members of a union or who already work for a particular employer also has been held to violate Title VII by perpetuating the past discriminatory practices or having a chilling effect on applicants when the workforce is predominantly white, as is the case here. See, *e. g., United States v. International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 1,* 438 F.2d 679, 683 (7th Cir. 1971), and the cases cited there.

■ 5. The Court ruled at time of trial and now restates its rulings and holdings that, based upon the evidence adduced and under the authorities discussed above, Defendant Local 6's requirements for apprenticeship and admission into membership as apprentices that applicants must be less than 22 years of age (or 24 with military service credit) and have a high school education or GED, as well as its stated preference for sons of members, are declared to be in violation of Title VII and unlawful.

6. However, as the Court also ruled at time of trial and now restates, Defendant Local 6's unlawful requirements and practices did not rise to such level as, within the Court's sound discretion under Section 706(g) of Title VII and in light of the authorities cited above, Local 6 should be held liable for any back pay herein. The Court thus holds that Local 6 is liable for injunctive and other affirmative relief to correct the effects of its unlawful practices, but not for back pay.

7. Plaintiffs' inability to retain their Local 1011 bargaining unit seniority after transfer into the Local 6 bargaining unit is not a violation of Title VII. The Supreme Court of the United States in *International Broth. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), established that a seniority system which is neutral on its face is protected as bona fide by Section 703(h) of Title VII. 42 U.S.C. § 2000e–2(h), even if it arguably perpetuates effects of past discriminatory conduct. In this case, the Local 6 seniority system is totally neutral, both on its face and in its operation, and has been consistently applied to persons of both the white and black races. It has been applied to members of the Plaintiff class in exactly the same fashion as to all other members of the Local 6 bargaining unit.

8. The Court entertained evidence on hiring of journeymen masons and now holds that Youngstown's method of hiring craft masons was not unlawful. It did not result in a disparate or adverse hiring ratio for blacks even during the period 2 July 1965—21 September 1969 for which Youngstown was found liable with respect to mason apprentice selection. To the contrary, Youngstown hired 37.58% black masons during this period, and that ratio in no way had any unlawful impact on blacks or Plaintiffs' class herein.

9. Youngstown has ceased the practices associated with use of an apprentice list which was held to unlawfully impede the movement of Plaintiffs to positions as mason apprentices and masons positions because of their race. Thus, Youngstown has eliminated the use of its former apprentice list and has posted all mason apprentice vacancies for bid for the last several years. The result of the postings for mason apprenticeship vacancies has been that 11 black mason helpers were selected by Youngstown. Those applicants approved by Local 6 were employed by Youngstown as mason apprentices, provided on-the-job apprentice training and progressively moved through their apprenticeship periods until such time as they became masons.

Under these circumstances, a Court order directed at Youngstown's discontinued practice with respect to mason apprentice selection would be superfluous and present unnecessary potential conflicts with Consent Decrees I and II, and the Court therefore declines, in the exercise of its discretion under Section 706(g) of Title VII to issue same. See, *e. g., Peltier v. City of Fargo*, 533 F.2d 374, 379–80 (8th Cir. 1976), denying general injunctive relief; *Nance v. Union Carbide Corp.*, 540 F.2d 718, 730 (4th Cir. 1976), vacated and remanded on other grounds for consideration in light of *International Broth. of Teamsters v. U. S.*, 431 U.S. 952, 97 S.Ct. 2671, 53 L.Ed.2d 268 (1977); *Harless v. Duck*, 14 FEP Cases 1616, 1627 (N.D.Ohio 1977).

10. One of the purposes of Title VII is to make persons whole for injuries suffered on account of unlawful discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Therefore, the Court should award to Plaintiffs as back pay a sum equal to the difference between what they actually earned during the relevant period and what they would have earned absent the unlawful discrimination. See, *e. g., Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309, 1321 (7th Cir. 1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

However, although Plaintiffs should be made whole for lost earnings, they are not entitled under Title VII to any windfall profits or other monetary sums. Thus, it is clearly established by the various federal courts that punitive damages may not be awarded, *e. g., Pearson v. Western Electric Co.*, 542 F.2d 1150, 1151–2 (10th Cir. 1976); *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 308–9 (6th Cir. 1975); vacated on other grounds, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977); *Richerson v. Jones*, 551 F.2d 918, 926–8 (3d Cir. 1977), nor may general compensatory damages for pain and suffering or the like. *E. g., Harrington v. Vandalia-Butler Board of Education*, 585 F.2d 192, 194–7 (6th Cir. 1978); *Schofield v. Stetson*, 459 F.Supp. 998, 999 (M.D.Ga.

1978); *Curran v. Portland Superintending School Committee*, 435 F.Supp. 1063, 1077–8 (D.Me.1977), and the numerous cases cited therein.

Moreover, The Supreme Court of the United States and various Courts of Appeals have established that back pay awards under Title VII are to be based upon the actual historical vacancies occurring during the relevant period of time. In *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court stated that in fashioning a remedy:

> the court must, as nearly as possible, "recreate the conditions and relationships that would have been had there been no" unlawful discrimination. *Franks [Franks v. Bowman Transp. Co.]* supra, 424 U.S. [747], at 769, 96 S.Ct. [1251], at 1266 [47 L.Ed.2d 444]. This process of recreating the past will necessarily involve a degree of approximation and imprecision. Because the class of victims may include some who did not apply for line-driver jobs as well as those who did, and because more than one minority employee may have been denied each line-driver vacancy, the court will be required to balance the equities of each minority employee's situation in allocating the limited number of vacancies that were discriminatorily refused to class members. (431 U.S. at 372, 97 S.Ct. at 1873)

In *United States v. United States Steel Corp.*, 520 F.2d 1043, 1055 (5th Cir. 1975), cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976), the Fifth Circuit stated

> . . . Part of "[t]he key is to avoid . . . granting a windfall to the class at the employer's expense. . . . "

Therefore, if the parties can reasonably reconstruct the history of the changes in the Fairfield workforce, the court should utilize those data for identifying "vacancies" in light of its decree, and should not presume that additional vacancies occurred. Apart from protecting the defendant, this method has the virtue of distributing the recovery to the victims who, by the greater likelihood, are entitled to it.

See also *United Transp. Union, Local 974 v. Norfolk & Western R. R. Co.*, 532 F.2d 336, 341 (4th Cir. 1975).

*Gross Backpay In This Case*

11. The uncontroverted historical reconstruction of actual mason apprentice vacancies at Youngstown's Indiana Harbor Works occurring between 2 July 1965 and 21 September 1969 is contained in Youngstown's Exhibit L, and shows that 1 of 11 or approximately 9% of the apprentice opportunities went to blacks. In the absence of discrimination in violation of Title VII, black employees presumably would have received between approximately 15% and 17% of those job vacancies (see finding par. 3 above). The Court can therefore enter the appropriate remedial order establishing that the gross back pay award is the difference between the average earnings of the black mason helpers and those white employees who were assigned the opportunities which a member or members of Plaintiffs' class should have been assigned in order to have produced from 15 to 17% black employee participation in the vacancies. The Court notes that the SMSA figure employed under Consent Decrees I and II at Youngstown's Indiana Harbor Works is 16%, and in order to resolve the ambiguity in the range of figures presented by Plaintiffs, the Court will, in the exercise of its sound discretion, hereafter adopt and utilize the figure of 16% which, in any event, falls in the middle of Plaintiffs' proffered range.

Further, there has been considerable dispute between the parties regarding the correct starting and ending dates of the period for which back pay should be computed. Plaintiffs urge the Court to go back to July 2, 1965 and continue until the present. Youngstown urges that the period should begin on a date 2 years prior to the date Plaintiffs filed their EEOC charges and end with the last date of the period for which Youngstown was found to have discriminated.

Upon close analysis of all the facts established in this case, the Court has concluded that neither party is entirely correct in either regard.

First, the back pay award would be the same in this case regardless of which beginning date for computation were chosen. The Court has determined that only one more black placement would have achieved over 16% (or even 17%) of total black placements as apprentices in the 4 years between 1965 and 1969. One black apprentice was hired during the first 2 years (in 1966) and the next would most likely not have been hired until the latter 2 year period. Given that complete precision as to the probable date of hire cannot be achieved, the Court hereby resolves the issue in favor of Plaintiffs by selecting as the vacancy computation date the earliest apprentice hiring which occurred within the latter 2 year period—that is, January 10, 1968.

■ Second, the Court rejects Youngstown's contention that the backpay period must necessarily end on the last date of the liability determination for the reason that, although Youngstown no longer discriminated thereafter, its prior actions were not fully remedied until such time as Plaintiffs were actually afforded the opportunity to participate in mason apprenticeship opportunities. The Court therefore holds that as a matter of law and within the Court's sound discretion the period over which back pay is to be computed is 10 January 1968— 10 February 1974 when Plaintiffs' class members actually were afforded the opportunity to become mason apprentices.

■ On the other hand, the Court is cognizant of the fact that Youngstown's total complement of masons and apprentices declined sharply between 1969 and 1974 (see Youngstown Exhibit J), and that Youngstown seized upon the first opportunity it had to enable Plaintiffs' class to participate in apprentice opportunities and correct the unlawful practices. It is within the sound discretion of the Court to award prejudgment interest. *Taylor v. Philips Industries, Inc.*, 593 F.2d 783 (7th Cir. 1979). In *Taylor* this Judge determined to deny prejudgment interest. *Taylor* was a case involving a claim of sex discrimination for a single plaintiff which was filed and tried in a most timely manner. Here, this case has now been pending for about eight years. Some of the delay is due to court congestion and the lack of judicial manpower in this district. Some is chargeable to counsel for all parties. There has been rampant inflation in the United States since 1971 and this Court has therefore determined to award prejudgment interest at the rate of 8% per annum in this case. The simple fact is that Defendant Youngstown has had the use and benefit of these monies for all these years.

12. Individual amounts of back pay may be awarded to those members of the Plaintiff class who prove their entitlement at the next stage of this proceeding by showing their qualifications and application for the position, or such other factors as are consistent with the principles of *Teamsters v. United States, supra.* Even if it is presumed that many or nearly all members of the class will be entitled to share in the back pay award, the amount each receives will depend upon the total number of class members who do ultimately show entitlement, as well as the degree of entitlement for each under the formula which the Court has devised for *pro rata* distribution of the gross award.

In *United States v. United States Steel Corp.*, 520 F.2d 1043, 1056 (5th Cir. 1975), *cert. den.* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976), the court was concerned with a situation where, as here, it was not realistic to decide exactly which member of Plaintiffs' class would have received a particular job. The Fifth Circuit recommended that under such circumstances, the individual awards be based upon a linear progression formula so that several class members could share in the computation resulting from a particular vacancy based upon the class members' relative earnings during the period involved.

Under Consent Decree I, the District Court in Alabama determined, under similar historical circumstances, that the affected class of employees should share in the overall back pay award based principally upon their respective lengths of service with the employer.

In *Stewart v. General Motors Corp.*, 542 F.2d 445, 452-3 (7th Cir. 1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977), the Seventh Circuit also recognized that where seniority or some other objective criterion is not the basis upon which the placements were actually made, exactitude cannot be achieved for each individual member of the class, and a classwide formula granting something to each member who shows entitlement is more appropriate.

■■■ In this case, the Court clearly cannot determine with any precision who from Plaintiffs' class would have received the particular job. Thus, under Section 706(g) of Title VII and in the exercise of its sound discretion, the Court holds that all members who show entitlement should receive some amount of back pay. Further, since all class members were employed prior to the back pay period and earned the same hourly wage as mason helpers, it is not practicable to make distinctions based on earnings or total length of service as in the *United States Steel Corp.* case, *supra*, or Consent Decree I. Rather the Court holds that the most equitable way to split the total back pay award is for each member who shows entitlement to be credited with 1 point for each calendar year during the back pay period in which he worked at least 1040 hours, and then to share in the total award in direct proportion to the percentage which his points bear to the total number of points calculated for all class members.

13. The Court also has reviewed and is thoroughly familiar with the Consent Decrees entered in the Northern District of Alabama. It is the intention of the Court to do nothing in this matter which would infringe upon or add inconsistency or ambiguity to the elaborate scheme of systemic relief provided there. On the other hand, the Court is of the belief that several of the equitable provisions contained in the Consent Decrees are instructive for this case, and the Court has therefore fashioned a number of analogous provisions which are set forth in the Order below.

■■■ 14. It is an established rule of law that employees who could have filed timely charges of discrimination with EEOC on the same date on which Plaintiffs filed their charges can be members of the class entitled to participate in the relief provided. *E. g., Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir. 1975), *cert. den.* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). See also *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

In this case, Judge Beamer on November 4, 1972 certified a class which at first blush appears to have required employment as a mason helper at Youngstown not only on the appropriate date after July 2, 1965 which is within Title VII's period of limitations, but also on the date that the order of certification was entered. Youngstown has argued, *inter alia*, that the certification order should be so interpreted. This Court cannot know what was in Judge Beamer's mind when he entered the order, but under the foregoing authorities the Court must construe the order of certification as requiring mason help status on only the Title VII statutory limitations date.

■■■ At the time the charges were filed in this case, Title VII provided for a limitations period of 90 days instead of the present 180 days. Since Plaintiffs' charges were filed with the EEOC on September 21, 1969, all persons employed as mason helpers on or after June 24, 1969 (90 days prior) are appropriately class members. Thus, the Court holds with respect to the contested class members that Plaintiffs Dent, Thomas and Patterson are appropriate class members who were mason helpers within the statutory period, and that Plaintiffs Hubbard and Brown are not appropriate class members since they were not mason helpers on or after June 24, 1969.

15. The Court has taken the issue of an award of attorney's fees under advisement pending final resolution of the other issues in this case, including specifically the matter of a back pay award. The Court will, at such time as the remaining issues have been determined and resolved, decide liability with respect to attorney fees. If required,

an evidentiary hearing on fees will be set. The Court will follow and be influenced by the recent teaching on the subject in *Dawson v. Pastrick*, 600 F.2d 70 (7th Cir. 1979), and *Konczak v. Ttyrrell*, 603 F.2d 13 (7th Cir. 1979).

### ORDER

Now, therefore, under the foregoing opinion and decision, and the Court's summary judgment decisions of May 12, 1977 and August 12, 1977, it is hereby ordered and directed as follows:

A. Defendant Local 6, its officers and agents, be and hereby are permanently enjoined and restrained from discriminating in any aspect of the mason apprentice selection, training or admission process or with respect to membership in Local 6 on the basis of race, and from failing or refusing to fully implement or to participate and cooperate in the implementation of all of the provisions of this remedial order.

B. Defendant Local 6 shall not use or consent to the use of Local 6's education, age and familial relationship requirements and preferences above held to be in violation of Title VII, unless and until such criteria have been validated in accordance with the Uniform Guidelines on Employee Selection Procedures, 43 F.R. 38290 *et seq.* (August 25, 1978), or unless Local 6, with respect to a specific criterion, can show that it has no disparate effect because of race and with regard to plaintiffs herein. However, notwithstanding any other provision of this remedial order, and except as applied to members of the plaintiff class for whom no maximum age limitation for selection and acceptance as mason apprentices shall apply, Defendant Local 6 (as well as Defendant Youngstown) may require that applicants for mason apprenticeship not exceed the age of 50 years at the time the apprenticeship training is to commence.

C. Plant continuous service at Youngstown's Indiana Harbor Works shall be used as the seniority criterion for selection of qualified mason apprentices. In determining other qualifications, Youngstown shall not use employee selection criteria unless they are valid in accordance with the Uniform Guidelines on Employee Selection Procedures, 43 F.R. 38290, *et seq.* (August 25, 1978), or unless Youngstown, with a specific criterion, can show that it has no disparate effect because of race. However, notwithstanding any other provision of this remedial order, and except as applied to members of the plaintiff class for whom no maximum age limitation for selection and acceptance as mason apprentices shall apply, Defendant Youngstown, as well as Defendant Local 6, may require that applicants for mason apprenticeship not exceed the age of 50 years at the time the apprenticeship training is to commence.

D. Vacancies for mason apprentice shall be posted on a plant-wide basis and shall be so filled from among qualified bidding employees. The bidding procedure shall include the following: (A) the notice of vacancy posted shall indicate the estimated number of apprentices needed, the date of posting, and the time and location where bids can be filed for the vacancy(ies) involved; (B) the bids shall be in writing on a form provided by Youngstown; and (C) the subsequent notice of successful bidder(s) posted by Youngstown shall indicate plant continuous service dates. Only if there are no qualified bidders for the vacancy(ies), Youngstown may obtain new hires as mason apprentices.

E. An implementing ration shall be applied for selection of black applicants for mason apprentice at Youngstown's Indiana Harbor Works and for acceptance and membership in Local 6, so that to the extent qualified black applicants are available from within the plant, they shall constitute not less than 37.5% of new mason apprentices employed, until such time as the representation of blacks in the mason craft at Youngstown constitutes 16% of the total persons employed, or until this remedial order expires.

F. A member of the Plaintiff class who successfully bids into a mason apprentice vacancy shall while working on such job be paid the higher of (1) the appropriate apprentice rate of pay or (2) his prior rate of

pay, under the same circumstances and on the same terms and conditions as provided in Consent Decree I.

G. Youngstown shall maintain for at least two years appropriate personnel, payroll, bidding, testing, and other records necessary to monitor compliance with and progress made under the provisions of this remedial order. Such records shall include for every vacancy posted hereunder the name, clock number, race, and plant service date of every bidder, with an indication of the prevailing bidder.

H. This remedial order remedies all acts and practices of discrimination by the Defendants to which Plaintiffs' lawsuit was or might have been directed, as well as any future effects of such acts and practices and, with respect to such matters, compliance with this remedial order shall be deemed to be compliance with Title VII and shall be deemed to satisfy any requirement or affirmative action by Defendants or either of them. The doctrines of *Res Judicata* and Collateral Estoppel shall apply to all members of Plaintiffs' class with respect to all issues of law and fact and matters of relief within the scope of the lawsuit leading to this remedial order.

I. No party's compliance status with regard to the terms of this remedial order shall be judged solely by whether or not it reached the goal and met the timetable and implementing ration set forth herein, but rather a party's compliance posture shall, if applicable, be determined by reviewing the extent of its good-faith efforts made toward compliance with this remedial order, and thus toward the realization of the goal within the timetable established.

J. Nothing contained in this remedial order is intended to be or shall be construed to be in conflict with the purposes, policies or provisions of Consent Decrees I and II. The Court hereby retains jurisdiction of this cause for the purpose of issuing any additional orders or decrees needed to effectuate, clarify or enforce the full purpose and intent of this remedial order. Any party may at any time petition this Court for any modification or change of this remedial order. Further, any time after the conclusion of two years from the date of this remedial order, any party may move to dissolve it in whole or in part.

K. The gross amount of back pay to be awarded to Plaintiffs' class (individual members who may be entitled to share in the award are listed on Exhibit A hereto) shall be computed by determining the difference during the period January 10, 1968 —February 10, 1974 between the average earnings of mason helpers and the earnings of that number of employees assigned as mason apprentices during such period in order to have achieved, together with already assigned black mason apprentices, 16% black employee participation in mason apprentices, vacancies occurring during the period of liability herein.

L. Plaintiffs and Defendant Youngstown are directed to meet and attempt to achieve and resolve the computation of the gross and individual amounts of back pay to be paid by Youngstown consistent with the above orders and directions. Failing an agreement between these parties covering such computations which is presented to the Court for approval within 60 days after the date of entry of this order, it is the Court's intention to refer the unresolved matters of computation to the Honorable James T. Moody, United States Magistrate, for hearing consistent with the following guidelines:

1. The Magistrate is to determine the amount of the difference in earnings from January 10, 1968 to February 10, 1974 pursuant to Paragraph K above.

2. The Magistrate is to determine which members of the class are entitled to share in the gross back pay award pursuant to the standards referred to in Paragraph 12 of the Conclusions of Law set forth above, and the individual amount each such class member is to receive.

3. The Magistrate shall hold all necessary hearings and shall file with this Court proposed findings of facts and conclusions of law on this subject. The Court would also encourage the Magis-

trate to act on this matter at the earliest time.

### EXHIBIT A

1. Ira Williams
2. Lawrence Easley
3. Horace Anderson
4. Paul Duckett
5. Noah Segrest
6. Earl Wynn
7. Crayton Jackson
8. Frank Carr
9. Freddie Greer
10. Eddie Jones
11. J. W. Lockhart
12. Alfred Edwards
13. J. L. Farmer
14. George Morris
15. Joseph Crump
16. Charles Jackson
17. Jimmie Myles
18. Excell Moore, Jr.
19. Walter Daniels
20. Robert Dickerson
21. Marion Penick
22. Manuel Baskin, Jr.
23. Arthur Jones
24. Clarence Hill
25. Roger Adams
26. Andrew Ross, Jr.
27. Adel Sholar
28. Harris German
29. Carrie Averett
30. Clifton Everett
31. Melvin Dickerson
32. Kinzie Hunter, Jr.
33. Roosevelt Upshaw
34. James Keel
35. Murphy Morgan
36. J. W. Hoover
37. Neel White
38. Cleother Flemming
39. J. W. Davis
40. Amos Holman
41. Willie Pace
42. R. C. McGhee
43. Percy Boyd
44. George Carter
45. James Flemming
46. Peter Dale
47. Clifton Armstrong
48. Donald Daniel
49. William Paulk
50. Ira Moore
51. James Mabon
52. Lonnie Lenard, Jr.
53. Horace I. Patterson
54. Sidney A. Dent
55. Samuel J. Thomas