Max LIBERLES, as President of and on behalf of Illinois Union of Social Service Employees, American Federation of State and Municipal Employees, AFL–CIO, Alice Allen, and all those persons listed in Appendix A of the Complaint (Sub-Class A), Individually and on behalf of all others similarly situated, Wilhelmena Ashby and all other persons listed in Appendix B of the Complaint (Sub-Class B), Individually and on behalf of all others similarly situated, Dorothy Bently, and all the persons listed in Appendix C of the Complaint, Individually and on behalf of all other persons similarly situated, Catherine Alexander, and other persons listed in Appendix D of the Complaint, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

David L. DANIEL, Director of the Cook County Department of Public Aid, George Dunne, President of the Cook County Board of Commissioners, Joseph M. Solon, Chairman of the Civil Service Commission of Cook County, Joel Edelman, Director of the State of Illinois Department of Public Aid, Nolan B. Jones, Director of the State of Illinois Department of Personnel, Defendants.

No. 73 C 3217.

United States District Court,
N. D. Illinois, E. D.

Sept. 10, 1979.

**506**

Charles J. Barnhill, Jr., Judson H. Miner, Chicago, Ill., for plaintiffs.

Bernard Carey, State's Atty., William J. Scott, Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

CROWLEY, District Judge.

This is a class action for employment discrimination brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and § 1 of the 1871 Civil Rights Act, 42 U.S.C. § 1983. Jurisdiction is based on 42 U.S.C. § 2000e–2(a)(2) and 28 U.S.C. § 1343. The plaintiffs are a group of black employees who worked for the Cook County Department of Public Aid (hereafter CCDPA) until it was merged into the Illinois Department of Public Aid (hereafter IDPA) effective January 1, 1974, at which time they became employees of IDPA. Defendants are those persons who were heads of the various local government agencies which had responsibility for administration of the public aid programs in Cook County during the period of time in question. These defendants are the Directors of the Cook County and State of Illinois Departments of Public Aid, the President of the Cook County Board of Commissioners and the Director of the Illinois Department of Personnel. Currently before the Court are cross-motions for summary judgment.

Plaintiffs allege that the administration of public assistance programs in Cook County is carried out by "case-workers" whose job classifications are divided into seven levels. As to the three lowest levels, plaintiffs allege that a racially discriminatory classification system was established and maintained whereby the two lowest classification levels (Case Aide Trainee and Case Aide) were composed primarily of black workers while the next higher classification level (Caseworker I) was staffed primarily by white workers.[1] This racial disparity, plaintiffs allege, was the result of the requirement that employees seeking promotion to the third level possess a college degree and pass a written examination. In December, 1972, the degree requirement was replaced with work experience. However, plaintiffs allege that the racial disparity continued. While apparently neutral on its face, plaintiffs allege that these promotion requirements had a disparate impact on black employees in violation of Title VII.

Further, plaintiffs allege that while on paper the third level jobs involved greater responsibilities, in fact Case Aides and Case Aide Trainees performed the same tasks as the higher paid Caseworkers I. While the most flagrant discriminatory elements of this system were eliminated in 1975 when the IDPA conducted a wholesale redefinition of job titles and reclassification of all employees, the continuing effects of the system are still felt by black employees.[2] Accordingly, plaintiffs seek to be "made whole" in the form of a back pay award.

---

1. After reclassification of job titles in 1975, Case Aide Trainee and Case Aide became Caseworker I and Caseworker II respectively. Caseworker I became Caseworker III. To eliminate confusion, we will refer to each job classification by its pre-reclassification title.

2. The state defendants argue that because of the 1975 reclassification by which many Case Aide Trainees and Case Aides were, in effect,

promoted, this cause is moot. This argument, however, is more appropriately addressed to the issue of relief rather than liability. Because plaintiffs seek an award of back pay for the period in question, there still remains a viable case or controversy over which this Court has jurisdiction. The availability of back pay as it is sought by plaintiffs will be addressed when the Court considers the question of relief.

■ Initially, plaintiffs have the burden of proving that an otherwise neutral employment practice has a disparate impact on a protected class within the meaning of Title VII. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). This may be accomplished through a statistical showing without proof of intent to discriminate. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Plaintiffs have shown that as of December 31, 1973, 91% of the Case Aide Trainees and 81% of the Case Aides were black while 81% of the Caseworkers I were white. The discriminatory nature of these statistics is compounded by the fact that for all intents and purposes Case Aide Trainees, Case Aides and Caseworkers I were performing the same tasks. (State defendants Exhibit 30, p. 1; State defendants Exhibit 26, pp. 6, 8, 19, 22, 23). In fact the only significant difference between the two lowest and the third classifications was in salary. (State defendants' Exhibit 31, p. 1.)[3]

■ Unquestionably, plaintiffs have shown that defendants' employment practices resulted in a concentration of blacks in the low-paid positions and whites in the higher-paid position even though Case Aide Trainees, Case Aides and Caseworkers I all performed essentially the same tasks. The statistics presented by plaintiffs and unrefuted by defendants[4] establish a prima facie showing of racial discrimination and the burden is shifted to defendants to prove that the disparities in the classification sys-

tem were the result of a bona fide occupational qualification or a business necessity.

■ Once the adverse impact of a job requirement on a protected group has been demonstrated, the employer must show that the requirement is job related. This is a particularly heavy burden where, as here, the requirement acts as a complete bar to employment in the sought-after position, *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). To show that a challenged job requirement is job related, an employer must prove that the business purpose of the requirement is sufficiently compelling as to override any discriminatory impact, that the requirement effectively serves the business purpose and that there is available no less discriminatory alternative. *Waters v. Wisconsin Steel Works of International Harvester,* 502 F.2d 1309 (7th Cir., 1974).

The challenged job requirements in the present case are, of course, the college degree and the written examination. Plaintiffs argue and defendants do not contest, that the disproportionate number of black in the two lowest classifications was the result of the college degree requirement for advancement into the third level. Until 1972, a prerequisite for promotion was a bachelor's degree. This requirement, plaintiffs argue, worked a proportionately greater hardship on blacks than on whites. Defendants do not dispute that in 1971 only 4.17% of Cook County's blacks over age 25 had attended four or more years of college while 12.39% of all others had similar educations. Further, when in 1972 the degree

---

3. In 1975, the IDPA conducted a wholesale reclassification of all employees whereby 60% of the Case Aide Trainees and Case Aides were re-classified to higher levels on the basis of the work they were doing. This is further evidence, according to plaintiffs, that the identity of work assignments without commensurate pay was unjustifiable. While defendants contest plaintiffs' interpretation of the data they do not contest the data. Nor do defendants seriously dispute plaintiffs' allegation that Case Aide Trainees and Case Aides were performing essentially the same work as Caseworkers.

4. Defendants argue that the entire group of social and case aide workers, all seven levels rather than only the three lowest groups of workers, must be considered as a unit. If this is done, defendants argue, no pattern of discrimination will be found. However, the gravamen of the complaint is that a disproportionate number of black workers were held in the lowest paying jobs and denied promotion into the next highest level job even though they were qualified for the position and in fact did the work of persons in the position. Plaintiffs do not allege that they were qualified for even higher paying jobs and therefore the racial composition of those levels is irrelevant.

requirement was dropped, defendants continued to require that applicants for promotion pass a written examination. Plaintiffs argue that this test, never validated as being related to job performance, worked an added hardship on black employees and perpetuated rather than ameliorated the challenged discriminatory system.

As to the college degree requirement, defendants argue that in imposing[5] the requirement they were merely complying with federal regulations and standards.[6] Defendants cite 45 C.F.R. §§ 220.5 and 220.6 which require the State, in the administration of welfare programs, to use "professional" and "sub-professional" staff. Sub-professional is defined as "persons with less than a college education." By implication, defendants argue, professional must mean persons with a college education. Further § 225.1(a) delineates the duties of sub-professionals and includes "tasks that are an integral part of the agency's service responsibilities to people and that can be performed by persons with less than a college degree."

Based on these sections defendants argue that the Case Aide Trainees and Case Aides, as sub-professional positions, were created to assist the professional Caseworkers. This is consistent, according to defend-

ants, with the federal government's stated purpose to provide welfare recipients and other persons of low income with employment as sub-professionals. 45 C.F.R. § 225.-1(a). In Cook County, a large percentage of welfare recipients are poorly educated and black. This, argues defendants, is the sole reason behind the disproportionately large number of black Case Aide Trainees and Case Aides.

Preliminarily, the fact that the degree requirement was set by federal regulation does not entitle it to any greater deference than typically given private employer-established job qualifications. Title VII principles are applied to governmental and private employers alike.[7] *Dothard v. Rawlinson*, 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Moreover, defendants' reliance on the cited federal regulations does not explain why plaintiffs stagnated in the lowest level jobs or why they were given less money to do work identical to work done by higher paid Caseworkers.

Pursuant to federal regulation, defendants were obliged to develop:

*A career service plan permitting persons to enter employment at the sub-professional level and, according to their abili-*

---

**5.** The County defendants argue that because they had no individual discretion in the imposition or enforcement of the challenged requirements, they cannot be held liable for the results. However, defendants are sued in the representative capacities as officials of plaintiffs' employer, Cook County.

**6.** Because the standards were originated by the federal government, defendants argue that the United States is a necessary party. Fed.R. Civ.P. 19. However, Title VII creates a statutory cause of action against an "employer" and the United States does not fit within that term as defined in the statute. 42 U.S.C. § 2000d(b).

**7.** *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) put to rest any doubts that local governments are subject to the back pay provisions of Title VII. The state defendants, however, argue that the availability of Title VII relief is prospective only and that, therefore, liability cannot attach in this cause for anything which occurred prior to June, 1976. County defendants, on the other hand, argue that defendants' liability, if any, can only

be based on conduct which took place after March 24, 1972, when Title VII became applicable to local governments.

In *United States v. City of Chicago*, 573 F.2d 416 (7th Cir., 1978), the Seventh Circuit, consistent with other Circuits which have addressed the issue, held that the provisions of the 1972 amendments are not retroactive. However, the Court also held that where the impact of the challenged job requirement continues beyond the effective date of the amendments, liability may attach for conduct occurring before March 24, 1972. Both the degree and examination requirements continued to be enforced after March 24, 1972. Moreover, the impact of the challenged conduct was exacerbated by a promotion freeze in 1974.

As to availability of back pay for the period before the decision in *Fitzpatrick v. Bitzer*, there is nothing in that case which would require restricting its application prospectively. Indeed the Supreme Court reversed the Court of Appeals holding that *retroactive* back pay was unavailable.

*ties, through work experience, pre-service and in-service training and educational leave with pay, progress to positions of increasing responsibility and reward*; 45 C.F.R. § 225.2(a)(3).

From the record, it is clear that plaintiffs did assume "increasing responsibility" but were deprived of any increasing "reward". On the other hand, the record reflects no support for defendants' assertions that through formal education the ability to deliver services is improved and that the "concept of professionalism has been inextricably linked with skills acquired by formal education." (County defendants' Memorandum in Support of Cross-Motion for Summary Judgment, p. 21). The contrary is true. From defendants' own proof, plaintiffs were qualified to perform tasks designated for Caseworkers, did in fact perform those tasks, but were not paid in accordance with their assumed responsibilities. Defendants stated purpose in imposing the degree requirement was to assure better service to welfare recipients. It is clear from this record that the requirement did not serve that purpose and was in no way related to it. Further, there was available an acceptable alternative to the degree requirement which would have accomplished the stated business purpose with less racial impact. Defendants demonstrated this themselves when they reclassified all the employees in 1975. Before 1975, defendants apparently made no effort to develop suitable alternatives. Accordingly, we find that the degree requirement was not a business necessity within the meaning of Title VII.

█ Similarly, the written examination which was required initially in conjunction with the degree requirement and later with a work experience requirement has not been shown to be a business necessity. There is a reference in the State defendants' memorandum that the examination was validated as predicative of job performance, in August 1973, by the Illinois Department of Personnel. The claim, however, is not supported by any evidence. Upon a silent record we cannot find that there is the necessary correlation between the examination and job performance to overcome plaintiffs' prima facie case. *Brito v. Zia Co.*, 478 F.2d 1200 (10th Cir., 1973).

Accordingly, there being no genuine issue of material fact, plaintiffs' motion for partial summary judgment on the issue of liability is granted, defendants' motions for summary judgment are denied.