709 F.2d 1122
 31 Fair Empl.Prac.Cas. 1537,
32 Empl. Prac. Dec. P 33,684
Max LIBERLES, et al., Plaintiffs-Appellees,
v.
COUNTY OF COOK; Jeffrey C. Miller, Director of the Illinois
Department of Public Aid; and Louis J. Giordano,
Director of the Illinois Department of
Personnel, Defendants-Appellants.
 Nos. 81-2352, 81-2353.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 14, 1982.
Decided May 26, 1983.
As Amended June 1, 1983.
 
 William A. Wenzel, Nancy K. Donnellan, Cook County Asst. State's Atty., Chicago, Ill., for defendants-appellants.
 George F. Galland, Jr., Davis, Miner, Barnhill & Galland Chtd., Chicago, Ill., for plaintiffs-appellees.
 Before ESCHBACH, Circuit Judge, SWYGERT, Senior Circuit Judge, and DUMBAULD, Senior District Judge.*
 SWYGERT, Senior Circuit Judge.
 
 
 1
 This is an equal pay for equal work case brought by a class of black employees against officials of the Cook County Department of Public Aid ("CCDPA") and the Illinois Department of Public Aid ("IDPA"). The district court entered summary judgment for the employees, 477 F.Supp. 504 (N.D.Ill.1979), and ordered backpay and injunctive relief. We affirm the district court's disposition of the merits, but reverse two aspects of the relief granted to plaintiffs.
 
 
 2
 Defendants object to nearly every aspect of this complex case. Defendants' procedural objections concerning the district court's jurisdiction and class certification are considered in Parts I and II, respectively, of this opinion. The relevant facts concerning the merits of plaintiffs' claim and the district court's disposition of the liability question are presented in Part III-A. Defendants' factual and legal objections to summary judgment are treated in Parts III-B and C. Part IV addresses subsidiary objections to the finding that these defendants must bear the responsibility and liability for the racial discrimination rather than another governmental unit. Finally, Part V considers defendants' numerous objections to the relief ordered by the district court.I
 
 
 3
 We first address defendants' contention that the district court lacked subject matter jurisdiction over plaintiffs' claims of employment discrimination. The relevant facts are as follows. First, the original charge filed with the Equal Employment Opportunity Commission ("EEOC"), pursuant to 42 U.S.C. Sec. 2000e-5 (1976), was not filed by a class or sub-class representative. It was filed by Liberles, the president of the union to which all class members belonged, on their behalf. Liberles is a named plaintiff in the federal court complaint, but he was not treated as a class member by the district court nor was any relief granted to him. Second, the original charge named the government entities and did not specifically name the titular heads of these entities who are the nominal defendants in this case. For example, the original charge named IDPA as the offending employer and not Edelman who was then the director of IDPA and who is a named defendant in this federal court action. Third, neither a copy of the original charge nor the EEOC right-to-sue letter are a part of the record originally filed with this appeal. Plaintiffs have supplemented the record here with the right-to-sue letter.
 
 
 4
 In Zipes v. TransWorld Airlines, Inc., 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), the Court held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." 455 U.S. at 393, 102 S.Ct. at 1132 (footnote omitted). Zipes ' basis is the statutory language of 42 U.S.C. Sec. 2000e-5(f)(3) (1976), the legislative history, and the fact that "a technical reading [of Title VII] would be 'particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process,' [Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) ] at 527 [92 S.Ct. at 619]." 455 U.S. at 397, 102 S.Ct. at 1134. Further, by holding that timely filing is not jurisdictional, the Court "honor[ed] the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer." Id. at 398, 102 S.Ct. at 1135. Another purpose of the filing requirements is to secure voluntary compliance with the law. Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719 (7th Cir.1969).
 
 
 5
 We agree with the reasoning of Jackson v. Seaboard Coast Line RR Co., 678 F.2d 992, 999-1010 (11th Cir.1982). In Jackson the court carefully reviewed the case law and legislative history of Title VII and concluded that it could "discern no rational basis for treating those [Title VII action preconditions, i.e., the requirements of 42 U.S.C. Sec. 2000e-5 (1976) ] that have not been considered from those that implicitly or explicitly have been held not to be jurisdictional." 678 F.2d at 1009 (footnote omitted). Accord Pinkard v. Pullman-Standard, 678 F.2d 1211, 1216-18 (5th Cir.1982). Further, if a defendant does not deny specifically and with particularity, as required by Fed.R.Civ.P. 9(c), the satisfaction of the Title VII lawsuit preconditions, the defendant cannot later assert that a condition precedent to the lawsuit has not been met. Jackson, 678 F.2d at 1010.
 
 
 6
 Defendants here failed to deny specifically and with particularity plaintiffs' satisfaction of the requirements of 42 U.S.C. Sec. 2000e-5. The only possible indication that the Title VII filing requirements had not been satisfied can be found in defendants' "Answer to the Complaint," in which defendants answered that they had insufficient information to admit or deny plaintiffs' allegations concerning the filing of an EEOC charge. As in Jackson, the defendants here cannot rest upon their averment of "insufficient knowledge" in the pleadings to preserve their defense.
 
 
 7
 During the nine years in which the matter was pending in the district court the defendants never brought these objections to the attention of the district court. Defendants moved for summary judgment asking the district court to decide the case on its merits. They failed to assert the defense in their "Proposed Final Order and Decree." It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal. Frank C. Bailey Enterprises, Inc. v. Cargill, Inc., 582 F.2d 333, 334 (5th Cir.1978); Crompton-Richmond Co., Inc.--Factors v. Smith, 392 F.2d 577, 577-78 (3d Cir.1967); Edward B. Marks Music Corp. v. Continental Record Co., 222 F.2d 488, 492 (2d Cir.), cert. denied, 350 U.S. 861, 76 S.Ct. 101, 100 L.Ed. 764 (1955).
 
 
 8
 This holding is particularly just in this case because the purposes of the filing requirement, to give prompt notice to the employer and to give the employer an opportunity to voluntarily comply with Title VII, were certainly satisfied by these plaintiffs. Defendants do not contend that they failed to receive timely notice of the alleged violations, that they had insufficient opportunity to voluntarily comply with Title VII, or that the substance of any of the Title VII filing requirements was not met. The original charge notified defendants that it was filed on behalf of the class and sought relief for the entire class. Defendants' objection to the original charge because it named the offending governmental entities surely elevates form over substance and is contrary to Zipes. See also Kaplan v. International Alliance of Theatrical & Stage Employees, 525 F.2d 1354, 1359 (9th Cir.1975) (It is sufficient that the EEOC be apprised, in general terms, of the alleged discriminating party.). Equally frivolous is defendants' contention that the federal court is ousted of jurisdiction because the record does not contain a copy of the original charge. On the basis of the documents in the record, there is no question that a timely charge was filed.
 
 
 9
 As to plaintiffs' challenge to the original charge because it was filed by Liberles, the law is clear that an organization may file a charge on behalf of its members and those members may seek relief in the federal courts.
 
 
 10
 Title VII does not require that as a prerequisite to suit an individual alleging discrimination must first file a complaint. Instead, the statutory language speaks of a charge filed by or on behalf of a person claiming to be aggrieved (42 U.S.C. Sec. 2000e-5(b)) (emphasis added) and states that a civil action may be brought by the person aggrieved (Sec. 2000e-5(f)(1)).
 
 
 11
 Eichman v. Indiana St. Univ. Bd. of Trustees, 597 F.2d 1104, 1108 (7th Cir.1979). See also EEOC v. Rinella & Rinella, 401 F.Supp. 175, 182-83 (N.D.Ill.1975). The technicality that Liberles was named in the complaint cannot obscure the fact that the district court properly acted only upon the claims of the aggrieved employees for relief.
 
 
 12
 Defendants also object to the jurisdiction of the district court under 42 U.S.C. Sec. 1983 (1976). Section 1983, of course, is not a jurisdictional statute. In any case, relief was granted under Title VII upon claims over which the district court had jurisdiction, and this objection is irrelevant.
 
 II
 
 13
 We next address defendants' arguments that class certification was improper. Defendants assert that at the time of certification the claims of at least some of the class members were moot. During the pendency of this suit some class members received some prospective relief in the form of promotions. The plaintiffs, however, maintained that this relief was inadequate, and, indeed, the final decree contains the requested injunctive relief. Obviously, plaintiffs' claims for injunctive relief were not moot at the time of certification.
 
 
 14
 Defendants also assert that plaintiffs' claims for backpay were moot at the time of certification because the district court, relying incorrectly upon Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), had erroneously ruled that the eleventh amendment barred such recovery. See Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976) (the eleventh amendment does not bar Title VII backpay relief against state and local government employers). Defendants' argument, reduced to its simplest form, is that a district court's erroneous ruling of law renders a claim moot. (Such a rule would surely simplify the role of the courts of appeals.) The mootness doctrine is inapposite to this situation. A claim may become moot when the plaintiff receives the relief sought or when it is factually, not legally, impossible to receive such relief. See 13 Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3533 at 263 (1975) (Supp.1979). The plaintiffs had neither received backpay nor was it factually impossible to receive backpay.
 
 
 15
 Defendants contend that some class members were estopped from bringing this claim by Schmidt v. Edelman, 64 CH 1908, a challenge to defendants' 1973-74 hiring freeze which concerned IDPA's promotion policy under the Illinois Personnel Code. Schmidt did not concern employment discrimination or backpay. Schmidt bears only a passing resemblance, by virtue of a slight similarity of parties, to this case and hardly satisfies any notion of collateral estoppel.
 
 
 16
 Defendants argue that class certification was improper because the class representatives did not personally file an EEOC charge. This objection, styled as "a failure to exhaust administrative remedies," is simply a repetition of defendants' challenge to jurisdiction. As discussed in Part I, supra, plaintiffs could and did properly invoke federal court jurisdiction.
 
 
 17
 Defendants raise several additional and insubstantial challenges to class certification. Class certification is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1006, 1129 n. 38 (7th Cir.), cert. denied, sub nom. General Motors Corp. v. Oswald, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979) (The trial court has broad discretion in determining whether to allow a class action to be maintained.). This is particularly true in employment discrimination cases. See Jordan v. County of Los Angeles, 669 F.2d 1311, 1318 (9th Cir.), vacated on other grounds, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (in Title VII cases, requirements of Fed.R.Civ.P. 23(a) should be liberally interpreted).
 
 
 18
 Defendants also assert that class certification was improper because plaintiffs moved for certification fourteen months after filing this action in federal court. This fourteen-month delay is attributable solely to the defendants' various motions to dismiss and defendants' unjustified delay, as the district court found, in complying with plaintiffs' discovery requests necessary for class certification. One sub-class consisted of only forty-eight members. These alleged errors do not amount to an abuse of discretion.
 
 III-A
 
 19
 Plaintiffs challenged the employment policies of CCDPA from 1972-1973 and IDPA from 1974-1975,[1] which determined the assignment and compensation of its casework staff. The casework staff was responsible for determining eligibility and the amount of public assistance grants for Cook County residents. Between 1972 and 1975, the casework staff relevant here was comprised of three categories of workers. Two categories, Case Aide Trainee and Case Aide, had starting pay in 1972 of $445.00 and $558.00 per month. ("Case Aides"[2].) The next higher category, "Caseworker I," had a starting pay in 1972 of $714.00. Eighty-three percent of the Case Aides were black. Eighty-one percent of the Caseworker I's were white.
 
 
 20
 Plaintiffs introduced extensive evidence demonstrating that from March 1, 1970 through March 24, 1972, the date Title VII became applicable to the defendants, to January 1, 1975, CCDPA and IDPA had a facially-neutral policy of assigning the Case Aides to the same tasks as the Caseworker I's. That is, in its assignment policy CCDPA and IDPA made no distinction between the work of the three classes of employees; the only distinction made by defendants was in the compensation received by each class.
 
 
 21
 The racial disparity between the Case Aides and the Caseworker I's was the result of defendants' hiring policies, policies which, as the plaintiffs' evidence showed, were followed both before and after the effective date of Title VII. These hiring policies consisted of requiring a four-year college degree ("bachelor's degree") and passing an examination as prerequisites to a position as a Caseworker I. These hiring policies had a disparate impact because nearly three times as many whites as blacks had a bachelor's degree in Cook County, the relevant location of the workforce, and the examination was biased towards those who had a bachelor's degree. Plaintiffs produced evidence that the examination was not validated.
 
 
 22
 The defendants offer a host of rebuttals and justifications to the plaintiffs' arguments and evidence. They challenge plaintiffs' proof of defendants' assignment policy. They assert that the assignment and compensation policy merely reflect the hiring practices of requiring a bachelor's degree and examination prior to the effective date of the Act. They assert that the examination was valid. They assert that the assignment and hiring policies were justified because the policies were dictated by the federal government. They also assert that their actions were justified because of budgetary constraints.
 
 
 23
 Although the bachelor's degree and examination requirements were officially eliminated by March 1973, this had no impact on the racial disparity between the three casework staff classifications, or, most significantly, on defendants' assignment and compensation policies. In 1973 CCDPA placed a hiring and promotion freeze on the Caseworker I classification. It continued to assign the Case Aides to the same tasks as Caseworker I's. The freeze continued until January 1975 when IDPA conducted a wholesale redefinition of job titles and reclassification of all employees. As a result, many members of the plaintiffs' class were reclassified and promoted.
 
 
 24
 After the 1975 reclassifications and promotions, two issues concerning defendants' liability remained. First, did the defendants practice racial discrimination between March 24, 1972 and the 1975 promotions? Second, were the 1975 promotions inadequate in the sense that the plaintiffs were entitled, because of the length of their employment, to promotions to a higher grade than they actually received?
 
 
 25
 In December 1973 plaintiffs filed this action in the federal court seeking backpay and injunctive relief. In September 1979 the district court granted plaintiffs' summary judgment motion. It found that "[u]nquestionably, plaintiffs have shown that defendants' employment practices resulted in a concentration of blacks in the low-paid positions and whites in the higher-paid positions even though the [three categories of employees] all performed essentially the same tasks." 477 F.Supp. at 507. "The discriminatory nature of these statistics is compounded by the fact that for all intents and purposes [the three categories of employees] were performing the same tasks. In fact, the only significant difference between the two lowest and the third classifications was in salary." Id. (citations to defendants' exhibits omitted) (footnote omitted).
 
 
 26
 The district court treated plaintiffs' claim as whether an otherwise neutral employment practice has a disparate impact on black employees, relying upon Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), and Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). 477 F.Supp. at 506-07. On the basis of the statistical evidence and the fact that the lower paid black workers did the same work as the higher paid white workers, the court found that plaintiffs had made a prima facie showing of racial discrimination. Id.
 
 
 27
 The court found that the federal regulations "d[id] not explain why plaintiffs stagnated in the lowest level jobs or why they were given less money to do work identical to work done by higher paid Caseworkers." 477 F.Supp. at 508. Further, the court found no evidence to support defendants' assertion that the examination was validated or that it was related to job performance. 477 F.Supp. at 509.
 
 III-B
 
 28
 Defendants argue that a full trial was necessary. Summary judgment, of course, is improper when there are material facts in dispute. Fed.R.Civ.P. 56; Fitzsimmons v. Best, 528 F.2d 692, 694 (7th Cir.1976); Mintz v. Mathers Fund, Inc., 463 F.2d 495, 498 (7th Cir.1972) (discussion of the purposes of summary judgment, the powers of the district court in considering summary judgment, and the role of appellate courts in reviewing summary judgment). Defendants assert that there is a dispute whether the three categories of workers performed the same tasks. Plaintiffs presented numerous exhibits indicating directly and by inference that this was defendants' policy. The district court cited only three of defendants' exhibits to support its findings. We take as true defendants' contention that no one of these three exhibits is conclusive.
 
 
 29
 While we would prefer, of course, a fuller statement of findings by the district court, we do not find a sufficient basis to disturb the district court's resolution of this question. Appellate courts should not strain to find the existence of genuine issues of material facts when none exist. Mintz, supra, 463 F.2d at 498. In contrast to plaintiff's many documents and affidavits presented to prove defendants' assignment policy, many of which are discussed in detail in their brief to this court, defendants can point to no document or affidavit which indicates that the three categories of workers did not perform the same tasks. See Fed.R.Civ.P. 56(e). This contrary evidence, if it existed at all, was readily available to defendants from their own files and employees. See Fed.R.Civ.P. 56(f). Viewing the evidence in a light most favorable to defendants, see United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), it is clear that there is no genuine dispute that the three categories of workers performed the same tasks.
 
 
 30
 Defendants also maintain that the material fact whether the examination was validated is in dispute. In support of this contention defendants point to an affidavit which concerns validation of an examination for the Case Aide position. At issue here is the examination administered for the Caseworker I position. The affidavit is obviously irrelevant. Defendants also point to an administrator's affidavit which contains only hearsay and legal conclusions. This affidavit is not entitled to consideration because it does not contain evidence admissible at trial. Fed.R.Civ.P. 56(e); American Security Co. v. Hamilton Glass Co., 254 F.2d 889, 893 (7th Cir.1958); 10A Wright & Miller, Federal Practice and Procedure Sec. 2738 pp. 467-74 (1983).
 
 
 31
 The County defendants maintain that there remains a genuine issue of fact regarding their proffered justification that IDPA made them discriminate. The County points to the same conclusory affidavit mentioned above and to a batch of twenty-five documents contained in its Appendix filed in this court. After an examination of these documents, we find the district court correctly found no evidence to support the County's assertion that its assignment and compensation policies were dictated by the federal or state government or that, if CCDPA did not follow these alleged mandates, its funding would have been cut off.
 
 
 32
 Finally, defendants assert that there are genuine issues of fact regarding the statistical analysis of the workforce and the inferences to be drawn therefrom. The statistics are not in dispute. Defendants' argument concerns the legal implications of these statistics. Their argument, therefore, does not concern the existence of a genuine issue of material fact. The district court was correct in deciding the merits of plaintiffs' claim on summary judgment.
 
 III-C
 
 33
 Defendants argue that the district court incorrectly applied various legal standards in granting summary judgment for plaintiffs. As the following discussion indicates, we conclude that summary judgment was properly granted, albeit on slightly different legal grounds than those expressed by the district court. See Miller v. Gateway Transportation Co., Inc., 616 F.2d 272, 275 n. 7 (7th Cir.1980) ("As in other cases, we 'may affirm on any ground that finds support in the record'. Mims v. Board of Education, 523 F.2d 711, 716 n. 2 (7th Cir.1975) (in appeal from summary judgment). See, e.g., United States v. General Motors Corp., 518 F.2d 420, 440-41 (D.C.Cir.1975); 6 Moore's, Federal Practice p 56.27 at 56-1561 (2d ed. 1979); 10 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2716 at 440 (1973)"). We are not unmindful of the caution required to protect defendants' interests. Plaintiffs' claim here is straightforward: unequal pay for equal work. The simplicity of the claim got lost, so to speak, in the trees of considering defendants' justification for their assignment and compensation policy.
 
 
 34
 To establish a prima facie case of disparate impact plaintiffs need only show that facially-neutral policies had a disproportionate impact on minorities. United States v. City of Chicago, 573 F.2d 416, 421 (7th Cir.1978). The policy challenged by the plaintiffs was defendants' policy of assigning Case Aides and Caseworker I's to the same work, but paying Case Aides less. The plaintiffs demonstrated that this assignment and compensation policy had a racially disparate effect because more than three-quarters of the Case Aides were black while more than three-quarters of the Caseworker I's were white.
 
 
 35
 Defendants' primary objection to plaintiffs' prima facie case concerns the proper statistics. The district court relied upon statistics indicating that 91% of the Case Aide Trainees and 81% of the Case Aides were black while 81% of the Caseworker I's were white, statistics comparing the racial composition of the three categories of workers. The district court stated that "the gravamen of the complaint is that a disproportionate number of black workers were held in the lowest paying jobs and denied promotion into the next highest level job even though they were qualified for the position and in fact did the work of persons in the position." 477 F.Supp. at 507, n. 4.
 
 
 36
 The district court's characterization of plaintiffs' claim was not precisely accurate. The gravamen of the complaint is that a disproportionate number of black workers were paid less than white workers who performed the same work. The qualifications issue, as discussed infra, is better treated as part of the analysis of defendants' justification of its racially disparate assignment and compensation policy.
 
 
 37
 The trial court used the correct statistics. Defendants' assertion that the proper comparison is between the racial composition and pay of each classification of defendants' entire workforce makes no sense. There is no allegation that the entire workforce performed the same work. Similarly, with respect to plaintiffs' prima facie case, it makes no sense to compare the racial composition of the Cook County labor force or welfare recipient pool to the racial composition of the Case Aides because the challenged policy does not concern barriers to blacks' access to the Case Aide position.
 
 
 38
 Defendants also object to plaintiffs' prima facie case because, they allege, plaintiffs did not establish that defendants' policy was the assignment of the three classes to the same work. As discussed in Part III-B, supra, plaintiffs presented voluminous evidence that this was defendants' policy, and defendants offered no evidence to the contrary. Indeed, defendants do not seriously challenge the existence of the policy. Rather, the focus of their objections is that the higher paid, predominantly white Caseworker I's were often assigned "subprofessional" tasks meant for the lower-paid, predominantly black Case Aides. That is, defendants assert that the Caseworker I's were overpaid. This assertion only reinforces plaintiffs' proof of defendants' assignment policy which was to draw no distinction in the assignments of the three categories of workers.[3]
 
 
 39
 Because plaintiffs proved a prima facie case of disparate impact, the burden shifted to IDPA and CCDPA to provide a legally-acceptable justification for the assignment and compensation policy which resulted in the racially disparate effect of unequal pay for equal work. See United States v. City of Chicago, supra, 573 F.2d at 421. Defendants do offer an explanation for the racial disparity between the groups: the test and bachelor's degree requirements for the higher-paid positions. But, it is illogical to maintain that these job requirements justified assigning the three classes of workers the same tasks but paying the predominantly black group less.
 
 
 40
 The distinction between the bachelor's degree and examination requirements as explanations or justifications of discriminatory effects, on the one hand, or, on the other hand, as policies to which plaintiffs object is significant. The district court did not clarify adequately this distinction. The bachelor's degree and examination requirements for the Caseworker I position were defendants' hiring policies prior to the effective date of Title VII.[4] "A public employer who from [March 24, 1972, the effective date of Title VII] forward made all of its decisions in a wholly non-discriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes." Hazelwood School District v. United States, 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977) (footnote omitted). If plaintiffs were challenging the hiring decisions of IDPA and CCDPA prior to the effective date of Title VII, Hazelwood might bar their claim. However, plaintiffs here do not challenge the defendants' pre-Act hiring policies, rather they challenge defendants' assignment and compensation policy--a policy which indisputably continued for two years prior to and three years after the effective date of the Act.
 
 
 41
 The fact that this assignment and compensation policy is related to pre-Act hiring policies does not defeat plaintiffs' claim, for it is the harm of the discriminatory post-Act assignment and compensation policy to which they object.[5] Thus, plaintiffs' claim is easily distinguishable from Hazelwood and United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In Hazelwood, defendant's hiring policy was challenged but the proof concerned practices prior to the effective date of the Act. 433 U.S. at 309-10, 97 S.Ct. at 2742-43. In Evans, plaintiff's challenge to defendant's seniority system was rejected, because, although the seniority system had the effect of causing a present harm due to a past and unactionable wrong, the seniority system itself was not discriminatory. 431 U.S. at 558, 560, 97 S.Ct. at 1889, 1890. Here, plaintiffs challenge defendants' post-Act assignment and compensation policy which was itself discriminatory.
 
 
 42
 The parties here dispute the precise nature of the burden of establishing a business justification. This circuit is in accord with other circuits that the employer must show that the practice is necessary to the safe and efficient operation of the business. Waters v. Wisconsin Steel Works of International Harvester Co., 502 F.2d 1309, 1321 (7th Cir.1974), cert. denied, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); Kirby v. Colony Furniture Co., 613 F.2d 696, 703-04 (8th Cir.1980); Rock v. Norfolk & Western Ry. Co., 473 F.2d 1344, 1349 (4th Cir.), cert. denied, sub. nom. United Transportation Union Lodge 550 v. Rock; 412 U.S. 933, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973); United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir.1971). This test finds support in Dothard v. Rawlinson, 433 U.S. 321, 331-32 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977).
 
 
 43
 The Ninth Circuit, in Contreras v. City of Los Angeles, 656 F.2d 1267 (9th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982), has adopted a seemingly less burdensome test. An employer need not show absolute business necessity. Although a mere "rational basis" will not suffice, proof of a manifest relationship to employment will satisfy Title VII requirements. 656 F.2d at 1276. It is important to note that the Contreras holding emerged from a case in which the challenged examination had undergone extensive validation study and expert testimony indicated its professional acceptability.
 
 
 44
 This appeal affords us no opportunity to reexamine the burden upon the employer to establish a legally acceptable justification. Turning to the test and bachelor's degree requirements, defendants do not assert that these requirements bore a manifest relationship to employment as a Caseworker I. As discussed in Part III-B, supra, there was no evidence that the test was professionally acceptable. Defendants assert that both requirements were eliminated prior to the effective date of the Act, and it is uncontested that the requirements were eliminated after March 1973. This fact does not benefit defendants: once the requirements were eliminated, defendants offer no justification having a manifest relationship to employment as a Case Aide or Caseworker I which would explain the racially disparate assignment and compensation policy.
 
 
 45
 Equally insufficient is defendants' proffered justification that the assignment and compensation policy or the bachelor's degree and examination requirements were the result of federal regulations. The explanation is not legally acceptable because, as the district court correctly found, it was not true that federal regulations imposed any of these policies upon the defendants. Defendants rely principally upon 45 C.F.R. Sec. 225.2(a)(3) which provides that
 
 
 46
 A career service plan permitting persons to enter employment at the sub-professional level and, according to their abilities, through work experience, pre-service and in-service training and educational leave with pay, progress to positions of increasing responsibility and reward.
 
 
 47
 There is no way that this regulation can be read to require defendants to permanently assign "sub-professional" Case Aides to the same work as "professional" Caseworker I's and pay the "sub-professionals" less. The district court properly analyzed defendants' "federal government" justification with respect to the bachelor's degree and examination requirements, 477 F.Supp. at 507-09, and we see no reason to repeat the analysis here.
 
 
 48
 Examining the evidence in a light most favorable to defendants, defendants established that the federal government encouraged or required defendants to hire welfare recipients and encouraged or required defendants to maintain a "professional" staff of caseworkers. The defendants presented no evidence that the federal government required defendants to employ welfare recipients to perform the same work as the professional staff, but to pay the welfare recipients less. As such, there is no showing that the assignment and compensation policy was dictated by the federal government.
 
 
 49
 IDPA asserts that it was legally justified in its assignment and compensation policy because "the State defendant's desire to continue to have the fiscal ability to provide welfare services." (IDPA reply br. at 19-20.) In other words, it was cheaper to pay the black workers less but require them to do the same work as the higher paid white workers. Defendants misconstrue the nature of a business justification under Title VII. The abstract goal of saving taxpayers' money is not a legally acceptable justification for paying protected minorities less money than white workers who perform the same work. Even under Contreras the challenged policy must bear a manifest relationship to the employment position at issue. The desire, however laudable, of county and state employers to save money does not bear a manifest relationship to the assignment and compensation of Case Aides or Caseworker I's.
 
 
 50
 Finally, defendants maintain that this "equal pay for equal work" claim should be analyzed under the standards for "disparate treatment" rather than "disparate impact," relying upon Presseisen v. Swarthmore College, 442 F.Supp. 593 (E.D.Pa.1977), aff'd, 582 F.2d 1275 (3d Cir.1978). The Presseisen court stated, "Since plaintiffs concede ... that the entire thrust of their case was to establish that disparate treatment was accorded [plaintiffs] ..., we need only concern ourselves with the 'disparate treatment' type of discrimination." Id. at 598. Presseisen does not contain a discussion of why disparate impact would be inappropriate, and, therefore, is not helpful.
 
 
 51
 Defendants offer no reason why this challenge to defendants' facially-neutral assignment and compensation policy should not be treated like any other Title VII challenge to a facially-neutral policy. It is rare, of course, that a plaintiff objecting to unequal pay for equal work can prove the existence of an employment policy with the statistically-requisite disparate impact. But the novelty of defendants' policy and its class-wide effect is hardly a sufficient reason to conclude that disparate impact analysis is inappropriate.
 
 IV
 
 52
 Even given the conclusion that IDPA and CCDPA violated Title VII in their assignment and compensation policy, both defendants claim they should not be financially responsible for the remedy ordered by the district court. Each relies upon the assertion that it was acting pursuant to "orders" from a higher governmental unit. The county maintains that it was acting merely as an arm of the State, and, therefore, the State bear the full financial liability. Both defendants argue a variant of the "federal government" justification, discussed in Part III-C, supra.
 
 
 53
 The County fails to distinguish the holding of the Illinois Supreme Court in Merrill v. Drazek, 62 Ill.2d 1, 338 N.E.2d 164 (1975). The Merrill plaintiffs, employees of CCDPA, sought a declaration whether prior to 1974 they were employees of the State entitled to the same job-related benefits as other IDPA employees, or employees of the County. The Illinois Supreme Court reviewed the statutes and legislative history and found that CCDPA employees were employees of the County. 62 Ill.2d at 7, 338 N.E.2d at 168. The County incorrectly relies upon Mount Healthy City School District v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Mackey v. Stanton, 586 F.2d 1126 (7th Cir.1978), cert. denied, 444 U.S. 882, 100 S.Ct. 172, 62 L.Ed.2d 112 (1979); and Carey v. Quern, 588 F.2d 230 (7th Cir.1978), to evade Merrill. These cases concern the extension of the eleventh amendment's umbrella of state sovereign immunity to lesser governmental entities. The eleventh amendment is not applicable, however, to employment discrimination suits against governmental entities. Fitzpatrick v. Bitzer, supra. The County offers no reason why Fitzpatrick and Merrill do not control the result reached by the district court below; CCDPA was a responsible employer in this case.
 
 
 54
 IDPA and CCDPA seek to absolve themselves of financial liability because the federal government was not joined as a defendant pursuant to Fed.R.Civ.P. 19(a).[6] Defendants' Rule 19 argument is two fold: (1) the federal government can be sued under Title VII, and (2) joinder of the federal government is proper under Rule 19. Neither ground, however, addresses the question whether the federal government was indispensable, such that dismissal of plaintiffs' claim is now proper. This distinction is critical because defendants bear a heavy burden on appeal from a judgment entered against them to establish their entitlement to dismissal.
 
 
 55
 When a case has reached the appeal stage, the matter is more complex. The judgment appealed from may not in fact affect the interest of any outsider even though there existed, before trial, a possibility that a judgment affecting his interest would be rendered.
 
 
 56
 Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 110-11, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968) (footnote omitted).
 
 
 57
 First, defendants assert that the federal government is a joint tortfeasor. As an employment agency,[7] defendants argue, the federal government was an active participant in the defendants' discriminatory assignment and compensation policy. The district court, as discussed supra at 17-18, correctly found this to be untrue. The federal government did not promulgate regulations requiring defendants to implement the challenged policy. The federal government's posture, therefore, is quite different from its posture in Thorn v. Richardson, 4 FEP 299 (W.D.Wash.1971). In Thorn the federal regulations on their face required state defendants to implement a sexually-discriminatory policy. Id. at 302. Because the judgment appealed from here did not in fact affect the interest of the federal government, the federal government cannot now be deemed an indispensable party such that dismissal of plaintiffs' action is the proper remedy.
 
 
 58
 Even if it were true that the federal government is a joint tortfeasor, defendants have not established its indispensability. Plaintiffs have received complete relief. The defendants are not threatened by multiple or inconsistent judgments. Defendants' only remaining Rule 19 argument is that the federal government could be jointly liable, relying upon Patterson v. Youngstown Sheet and Tube Co., 475 F.Supp. 344 (N.D.Ind.1979), aff'd, 659 F.2d 736 (7th Cir.), cert. denied, 454 U.S. 1100, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981) ("[A] union may be held liable with an employer when there is a 'genuine nexus' or sufficient connection between an employer's and the union's conduct which is found to be unlawful, Myers v. Gilman Paper Corp., 544 F.2d 837, 848 (5th Cir.1977); Sagers v. Yellow Freight System, Inc., 529 F.2d 721 (5th Cir.1976)," "but here there was an insufficient nexus to hold this union liable." 475 F.Supp. at 352.). The fact that the federal government could be liable, however, does not establish defendants' entitlement to contribution from the federal government. In Northwest Airlines, Inc. v. Transport Workers Union, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), the Supreme Court concluded that Title VII joint tortfeasors are not entitled to contribution. In Northwest Airlines the Court held that, even assuming that a union bears significant responsibility for discriminatory practices, 451 U.S. at 90, 101 S.Ct. at 1579-80, Title VII does not contain an implied right to contribution, 451 U.S. at 95, 101 S.Ct. at 1582. Similarly, the defendants here have no implied right to contribution from the federal government even if it did bear a significant responsibility for defendants' discriminatory practices. Thus, defendants were not prejudiced by the failure to join the federal government as an indispensable party.
 
 
 59
 Defendants' alternative Rule 19 argument is that the federal government indemnifies these defendants against a backpay award. The statute, 42 U.S.C. Sec. 603(a)(3)(A) (1976) and regulations, 45 C.F.R. Secs. 20.61(a)(1), (3) (1973), upon which the defendants rely are merely general provisions concerning federal financial participation in the costs of welfare programs. Whether these provisions entitle defendants to indemnification for their liability for their racially-discriminatory assignment and compensation policy is a legal question wholly separate and distinct from the legal questions addressed in this lawsuit. Regardless of the federal government's secondary liability as an indemnifier, defendants are primarily liable for their discriminatory policy. As such, no legal interest of the federal government was affected by this lawsuit. The prejudice suffered by defendants is merely the possible inconvenience of a second lawsuit--an inconvenience due solely to their failure to file a third-party complaint pursuant to Fed.R.Civ.P. 14. This inconvenience does not, in equity and good conscience, see Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 109, 88 S.Ct. 733, 737, 19 L.Ed.2d 936 (1968), entitle defendants to dismissal of plaintiffs' claim.
 
 V
 
 60
 Defendants challenge the propriety of various aspects of the relief awarded by the district court. It would seem well settled that retroactive relief or backpay awards against state and local governmental entities who unlawfully discriminate, either through disparate impact or disparate treatment, against their employees is appropriate. Fitzpatrick v. Bitzer, supra; Albemarle Paper Co. v. Moody, supra; United States v. City of Chicago, supra, 573 F.2d at 422-24. Nevertheless, defendants assert that Title VII cannot constitutionally be applied to states and counties in the absence of proof of purposeful discrimination. Or, in other words, that Congress should not be allowed, through the enforcement clause of the fourteenth amendment and the 1972 amendments of Title VII to impose a greater liability upon the states than would be imposed under the substantive provisions of the fourteenth amendment. We recently rejected this argument:
 
 
 61
 It does not follow, however, that because the Supreme Court found these government policies not to be violations of equal protection that Congress cannot legislate a stricter standard of conduct. Such a conclusion would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the "majestic generalities" of the [Fourteenth] Amendment. Katzenbach v. Morgan, 384 U.S. 641, 647-649 [86 S.Ct. 1717, 1721-1723, 16 L.Ed.2d 828] (1966).
 
 
 62
 EEOC v. Elrod, 674 F.2d 601, 608 n. 6 (7th Cir.1982).
 
 
 63
 As an alternative to their constitutional challenge to the award of backpay to the aggrieved black employees, defendants assert that it would be inequitable and unfair to require them to make these plaintiffs whole. In Albemarle Paper, supra, the Court stated: "[B]ack pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." 422 U.S. at 421, 95 S.Ct. at 2373 (footnote omitted). This is a presumption favoring backpay which can seldom be overcome. City of Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 719, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 (1978). Defendants' only argument against the award is that it is expensive and will hurt taxpayers. Obviously, such a reason if applied generally would frustrate the statutory purpose of making persons whole for injuries suffered through past discrimination by governmental units. More important, such a reason for denial of backpay would undermine Title VII by sending a clear message to state and local governments that they may discriminate against their employees, in violation of Title VII, and incur no financial liability.
 
 
 64
 Defendants next object to the relief granted by the district court because it did not order individualized hearings concerning each class member's entitlement to backpay. Defendants wrongly rely upon Stewart v. General Motors Corp., 542 F.2d 445 (7th Cir.1976), cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977), where this court stated "an individualized remedy should be utilized because it will best compensate the victims of discrimination without unfairly penalizing the employer." 542 F.2d at 452 (citation omitted). This statement does not stand for the proposition that individualized hearings are necessary. Rather, it is responsive to "the first issue which must be clarified is whether backpay should be awarded on an individualized basis to particular employees or on a classwide basis to be divided among the entire group which they represent." Id. The relief at issue here satisfies this "individualized remedy" reference.
 
 
 65
 In Stewart we concluded that individualized hearings were appropriate to determine which employees of the class were entitled to backpay due to the employer's discriminatory promotion policy. 542 F.2d at 453. It was obvious in Stewart that not all members of the class would have been promoted but for the discriminatory promotion policy. That concern, however, is not present in this case. The uncontested evidence is that IDPA and CCDPA made no distinctions in assignments of Caseworkers I's, Case Aides, or Case Aide Trainees. The only distinction was in salary. On such facts, individualized hearings are unnecessary because all three groups of workers were entitled to be paid the same amount.
 
 
 66
 In Stewart, we set forth three general rules concerning the mechanics of backpay awards: "(1) unrealistic exactitude is not required; (2) ambiguities in what an employee or group of employees would have earned, but for discrimination, should be resolved against the discriminating employer; and (3) the district court, far closer to the facts of the case than we can ever be, must be granted wide discretion in resolving ambiguities." Id. at 452. Certainly, there has been no showing of an abuse of discretion.
 
 
 67
 Defendants also challenge the award of injunctive relief. The injunctive relief ordered by the district court addressed the fact that IDPA's 1975 reclassification and promotion of Case Aides and Case Aide Trainees did not sufficiently account for their seniority.
 
 
 68
 Where racial discrimination is concerned, the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future. Albemarle Paper, supra, [422 U.S.] at 418 [95 S.Ct. at 2372] ... The fashioning of appropriate remedies invokes the sound equitable discretion of the district courts.
 
 
 69
 Franks v. Bowman Transportation Co., 424 U.S. 747, 770, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976). Defendants offer no reason why the district court abused its discretion.
 
 
 70
 As part of the relief ordered by the district court, some plaintiffs will receive backpay and seniority adjustments for a period of two years prior to filing of the EEOC complaint. This relief includes a period prior to the date the Act became applicable to defendants, March 24, 1972. Neither CCDPA nor IDPA objected to this pre-effective date component of the backpay and seniority relief before the district court. CCDPA did not object in its opening brief to this court, but it raised the issue in its reply brief here. In analyzing CCDPA's belated objection, we noted that IDPA has a similar objection with respect to the seniority award. Although we are without the benefit of either the district court's views or plaintiffs' written response, we answer these objections because this is a legal question relating solely to congressional intent and statutory construction and because of the delay already experienced in this case.
 
 
 71
 CCDPA and IDPA can rely upon powerful language in Albemarle Paper, supra, and International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In Albemarle Paper, the Court held that
 
 
 72
 [u]nder Title VII backpay liability exists only for practices occurring after the effective date of the Act, July 2, 1965, and accrues only from a date two years prior to the filing of a charge with the EEOC. See 42 U.S.C. Sec. 2000e-5(g) (1970 ed., Supp. III). Thus no award was possible with respect to the plant's pre-1964 policy of "strict segregation."
 
 
 73
 422 U.S. at 410 n. 3, 95 S.Ct. at 2368 n. 3. See also Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1378 (5th Cir.1974) (Recovery under Title VII is limited to the Act's effective date, although under the two-year backpay provision, plaintiff was entitled to backpay prior to the effective date of the Act.). In Teamsters the Court held that "[n]o person may be given retroactive seniority to a date earlier than the effective date of the Act." 431 U.S. at 356-57, 97 S.Ct. at 1865.
 
 
 74
 Several cases seem contrary to this pronouncement. In McKenzie v. Sawyer, 684 F.2d 62 (D.C.Cir.1982), and Thompson v. Sawyer, 678 F.2d 257 (D.C.Cir.1982), the court applied the two-year backpay provision against the federal government, even though the result was an award relating to a time prior to the effective date of Title VII to the federal government. 684 F.2d at 78; 678 F.2d at 287-91. The McKenzie and Thompson courts relied on the fact that the 1972 amendments to Title VII "only added a forum and procedures for federal employees--it was not the date of birth of the right to a federal job free of racial or sexual bias." 678 F.2d at 287. An August 8, 1969 Executive Order specifically prohibited employment discrimination. Id. In Chisholm v. United States Postal Service, 665 F.2d 482 (1981), the Fourth Circuit similarly applied the two-year backpay provision to a case in which the Civil Service administrative complaint, pursuant to the same Executive Order, was pending on the effective date of Title VII. Id. at 488-90.
 
 
 75
 In United States v. City of Chicago, 549 F.2d 415 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), we held that, "[E]ven though Title VII did not become applicable to the City until 1972, the court had an obligation to correct the present consequences of discriminatory conduct that occurred before that date." 549 F.2d at 436 (citations omitted). Therefore, we held that the district court had the authority to impose mandatory hiring and promotion quotas. Id. at 436-37.
 
 
 76
 We do not feel that these decisions warrant extension of backpay or seniority relief to compensate for IDPA's and CCDPA's actions prior to the time their actions became unlawful. The federal employers in Thompson, Chisholm, and McKenzie were under an identical federal duty before and after the 1972 amendments. In contrast, CCDPA and IDPA were not under an identical federal duty. Rather, by virtue of the fourteenth amendment, CCDPA and IDPA were under a pre-Act duty not to intentionally discriminate, and no violation of that duty has been shown here. Absent explicit congressional intent to authorize backpay and seniority relief for pre-Act violations, we must conclude that Congress did not intend the unusual result sought here. Title VII's two-year backpay and seniority provisions do not extend to actions by state and local governments prior to the effective date of the Act.
 
 
 77
 We have considered all of defendants' remaining objections and find them to be without merit.
 
 
 78
 The judgment of the district court is remanded for disposition in accord with this opinion.
 
 
 
 *
 The Honorable Edward Dumbauld, United States Senior District Judge for the Western District of Pennsylvania, is sitting by designation
 
 
 [1]
 When this dispute arose, CCDPA was an agency of Cook County and plaintiffs were employees of CCDPA. On January 1, 1974, CCDPA became a part of IDPA, Ill.Rev.Stat.1979 ch. 23 Sec. 12-18.1(2), and plaintiffs became employees of IDPA
 
 
 [2]
 Because it is plaintiffs' contention that defendants drew no distinction between Case Aides and Case Aide Trainees (other than in salary), the two groups will be jointly referred to as "Case Aides," unless otherwise indicated
 
 
 [3]
 Defendants suggest that it is improper to view the claims of the fourth subclass, defined as those Case Aides performing "case aide" work only, as claims for equal pay and not for promotion. Reading the record, the picture of defendants' public aid offices which emerges is one in which no distinctions were drawn between the work assignments of caseworkers, case aides, and case aide trainees. Some case aides and caseworkers performed what was described as caseworker work. As the defendants admit "[t]here is extensive evidence of record that in some situations Caseworkers I were underutilized and were doing the work of Case Aides and Case Aide Trainees." (emphasis added.) Notice, however, that the word "underutilized" is defendants' characterization and does not fit the facts. If on an "extensive" basis caseworkers perform the work of case aides, it is not logical to conclude that caseworkers were underutilized. A more logical conclusion is that the official job description of caseworkers was simply inaccurate; caseworker work in fact also included case aide work. This conclusion is borne out by the fact that defendants themselves, after the lawsuit was filed, reclassified all of the workers, former caseworkers, former case aides, and former case aide trainees, to essentially one job title
 By the defendants' own statements, it is clear that on an extensive basis black low-paid workers performed the same work as white high-paid workers. This is as true for subclass four as for subclasses one, two, and three. As such, the members of subclass four's claim for relief, equal pay for equal work, is identical and they are entitled to the same relief.
 
 
 [4]
 There is evidence that these hiring policies continued after the effective date of Title VII, but this evidence is not relevant to the present discussion
 
 
 [5]
 This distinction is cogently discussed in Presseisen v. Swarthmore College, 442 F.Supp. 593, 601-03 (E.D.Pa.1977), aff'd, 582 F.2d 1275 (3d Cir.1978)
 
 
 [6]
 Fed.R.Civ.P. 19(a) provides in relevant part:
 (a) PERSONS TO BE JOINED IF FEASIBLE. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action in his absence is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.
 
 
 [7]
 42 U.S.C. Sec. 2000e(c) (1976) defines an employment agency as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such person." Under 42 U.S.C. Sec. 2000e(a) (1976), a governmental agency may be an employment agency